UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:06CR626 CAS |
| | ) | |
| PAUL BOSCH, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). Presently pending before the undersigned for report and recommendation are Defendant's Motion to Suppress Statements (Doc. #18); Defendant's Motion to Suppress Evidence (Doc. #19), and Defendant's Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction (Doc. #20). A hearing was held on the pretrial motions on December 12, 2006.

### #20–Defendant's Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction

The Defendant contends that his motion to dismiss must be granted because what he refers to as the "Lopez trilogy" of cases requires the dismissal. The three cases in this trilogy, according to the Defendant, are Jones v. United States, 529 U.S. 848 (2000); United States v. Morrison, 529 U.S. 198 (2000), and United States v. Lopez, 514 U.S. 549 (1995). The Defendant contends that in light of these three cases, the felon in possession statute under 18 U.S.C. § 922(g), no longer bears sufficient nexus to interstate commerce to fall within the enumerated powers of the federal government.

The United States Court of Appeals for the Eighth Circuit has directly considered this exact same challenge and has summarily rejected it. In so holding, the court stated as follows:

> In V, Gary argues that three Supreme Court decisions require this court to find 18 U.S.C. § 922(g)(1) unconstitutional: Jones v. United States, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (involving the Organized Crime Control Act, 18 U.S.C. § 844(i), United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (involving the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(1)(A)), and United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (involving the Violence Against Women Act, 42 U.S.C. § 13981). Each of these cases struck down statutes as unconstitutional exercises of the Commerce Clause because the statutes were not directed at interstate commerce. " 'We review federal constitutional questions de novo.' " United States v. Bates, 77 F.3d 1101, 1104 (8th Cir. 1996) (quoting United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995)).
>
> We have repeatedly rejected constitutional challenges to § 922(g)(1). Recently, we upheld the constitutionality of § 922(g)(1) against a Commerce Clause challenge. United States v. Shepherd, 284 F.3d 965, 969 (8th Cir. 2002). Accordingly, Gary's constitutional claim fails. United States v. Prior, 107 F.3d 654, 660 (8th Cir. 1997) (stating that one panel cannot overrule another).

See United States v. Gary, 341 F.3d 829, 835 (8thCir. 2003).

Therefore, based on the above, the undersigned concludes that the indictment should not be dismissed for lack of subject matter jurisdiction. See also United States v. Leathers, 354 F.3d 955, 959 (8th Cir. 2004).

## #18–Defendant's Motion to Suppress Statements; #19–Defendant's Motion to Suppress Evidence

Based upon the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

<h1 align="center">Findings of Fact</h1>

Howard Eaton is a Special Officer assigned to the Federal Bureau of Investigation (FBI) in St. Louis, Missouri. On or about October 18, 2006, Special Officer Eaton and Special Officer Wesley Gary also of the FBI applied to a federal magistrate judge for a warrant to search the premises at #2 Manderly Court in Festus, Missouri. The affidavit in support of the search warrant states in pertinent part as follows: In the spring of 2006, FBI agents received information from a Festus, Missouri police detective that Paul Bosch, who was a convicted felon (a sex offender), recently had moved to #2 Manderly Court in Festus, Missouri. The detective told the agents that he was aware that the Defendant had displayed firearms on the walls at his prior residence also in Jefferson County, Missouri. Further, a confidential informant told the FBI that Bosch, in the fall of 2005, was in possession of a firearm while traveling in his vehicle. Further, a second and separate confidential informant told the FBI that the confidential informant had contact with Bosch inside his prior residence in November of 2005. At that time, the confidential informant observed numerous firearms, shotguns, rifles, and handguns, many of which were mounted on the walls of the Defendant's prior residence. The agents also told the judge in the affidavit that based on their experience investigating firearms violators and violations, persons who possess firearms in this manner often possess them for a period of many years and do not dispose of them. Therefore, the agents stated that they believed it was probable that the Defendant was still in possession of the firearms in his current house at #2 Manderly Court. The agents likewise told the judge that a check of Bosch's criminal record revealed that Bosch had been convicted of stealing by deceit and sodomy, and had been sentenced to thirteen years imprisonment. The agents also confirmed the Defendant lives at #2 Manderly Court by checking utility records and the registration of the Defendant's vehicle parked in the driveway.

Significantly, the officers told the judge that the warrant would only be executed after they observed firearms on the premises at Manderly Court and would not be executed if no firearms were observed on the premises. Based on the above affidavit, the judge issued an anticipatory warrant to search the premises at #2 Manderly Court and to seize firearms and ammunition, stating on the warrant in bold letters, "This warrant shall be executed only after you make observations of firearms or ammunition at the above described premises. Otherwise this warrant shall not be executed."

On October 19, 2006, Eaton and four other agents and two sheriff's deputies went to #2 Manderly Court. The sheriff's deputies were in full uniform, and the FBI agents were dressed in blue jackets clearly marking them as FBI personnel. Eaton and a deputy sheriff walked to the door at #2 Manderly Court with the other agents in a line behind them. The deputy sheriff knocked on the door, and in a short period of time the Defendant came to the door and asked who was there. The deputy sheriff responded that it was the "sheriff's department" and the Defendant opened the door. As the Defendant opened the door, he took a step back from the door allowing room for a person to enter the foyer area of his home. Based on this movement back from the door and the Defendant's demeanor and body language, Eaton believed that it was okay for him to enter the foyer area of the house. Eaton took one step into the foyer area to talk to the Defendant. The Defendant did not object to Eaton entering the house, did not tell him not to enter the house, and did not ask him to leave.

Once Eaton was inside the house, he told the Defendant that the agents and officers were in the area looking for an armed and dangerous fugitive who they believed was in the subdivision in which the Defendant lived. They showed the Defendant a picture of the alleged fugitive, and asked

the Defendant if it was okay for them to look through the house for the fugitive.[1] Bosch said that

there was nobody in the house but he and his wife, and he did not know the person depicted in the

picture. Eaton then told Bosch that a source had told the agents that the source recently observed

the fugitive drive into Bosch's subdivision behind the wheel of a red pickup truck. Eaton noted that

Bosch had a similar red pickup truck parked in his driveway. Eaton told Bosch that the agents really

needed to look and see if the fugitive was in the house, and that the search was for Bosch's safety as

well as the community's safety since the fugitive was violent. The Defendant told Eaton that he did

not want them to look around the house. Eaton again told Bosch that he really needed to look for

the fugitive, and Bosch again said he did not want them to look through the house. At that point,

another agent asked Bosch if there was a particular reason that he did not want them to look through

the house for the fugitive. At this point, the Defendant said that he had weapons in the house and did

not want people walking around where the weapons were located. Eaton asked the Defendant what

kind of weapons he had, and the Defendant replied that he had "shotguns and rifles." Slightly less

than two minutes time elapsed from the moment that Eaton entered the door of the house to the

statement made by the Defendant that he had shotguns and rifles in the house. No threats or promises

were made to the Defendant at any point in time during this conversation. Further, Eaton and the

other agent in the house did not raise their voices, did not draw their guns, and their conversation

with the Defendant was businesslike.[2]

---

[1] This story was a ruse. It was a scenario that the agents made up in order to gain entry to the interior rooms of the house.

[2] At the hearing it also was revealed through the testimony of the Defendant that the Defendant was a prior convicted felon who was familiar with the criminal justice system. The Defendant was aware of his rights including his right to remain silent, and his right to have a lawyer present with him during any questioning by authorities. The Defendant was also aware that his house

When the Defendant admitted that he had a shotgun and a rifle in the house, Eaton believed that he had probable cause to arrest the Defendant for being a felon in possession of a firearm because Eaton truly believed that the Defendant did have firearms in the house. For this reason, Eaton arrested the Defendant and placed him in handcuffs. Eaton also believed that the admission of the Defendant that he had shotguns and firearms on the premises was the equivalent of his seeing the firearms, and that, therefore, the search warrant was triggered by the admission and he could execute the warrant. He also gave a copy of the warrant to the Defendant at that time. However, before the warrant physically was executed, Eaton determined that he should conduct a protective sweep of the premises pursuant to the Defendant's arrest. [3]

The purpose of the sweep was for the safety of the officers involved. The officers were aware by the Defendant's admission that there were weapons on the premises and had no idea who, if anyone else, was on the premises. In addition, Eaton had information from other sources that Bosch claimed that he had shot a police officer in Albuquerque, New Mexico, and said that he would rather die in a shoot-out with police than go back to jail. He said his health was so poor that he would not go back to jail. Eaton also had information that the Defendant carried a pistol with him in his truck at all times, and kept a large amount of cash handy so he could leave on a moment's notice. Also, when Eaton entered the house, he observed in close proximity to the front door, several bladed

---

could not be searched without "probable cause" and a search warrant, and that he had the right to "protect myself from unreasonable searches without a warrant."

[3]     Although Eaton testified that he "executed" the warrant at the time the Defendant said guns were in the house, he also unequivocally testified that a protective sweep occurred based solely on the arrest of the Defendant and that this protective sweep occurred immediately after the Defendant was arrested and before any firearms were observed and seized. The firearms were first observed during the protective sweep pursuant to the arrest and prior to any "execution" of the warrant in any real terms.

weapons, including a sword, a club with sharp metal spikes protruding from it, and a club with a metal ball hanging from the club with metal spikes on the ball. Because of all of the above, Eaton conducted a protective sweep of the premises immediately after the arrest. During the sweep of the premises, Eaton observed several rifles and shotguns hanging on the wall of the computer room in the Defendant's residence. Eaton observed these weapons from outside of the room in the hallway, which was only about fifteen feet from where the Defendant was initially encountered. After seeing these weapons during the sweep and determining that there were no other individuals on the premises, Eaton and the other agents proceeded to execute the search warrant.

According to the Defendant, he was handcuffed "gently" and sat down at the kitchen table with his wife. Although the Defendant was not advised of his <u>Miranda</u> rights during the search, he nevertheless was treated courteously and he was not threatened or intimidated. The agents did not immediately advise the Defendant of his rights because they did not intend to question him at that time.

Agent Wesley Gary sat with the Defendant during the search which took approximately two hours. During the time that Gary was sitting with the Defendant, the Defendant made several statements to Gary that did not come in response to any questions by Gary or anyone else. The Defendant first asked Gary if the agents were going to seize the Defendant's home, which is actually a mobile home. Gary told him that the home would not be seized. The Defendant next asked Gary if his wife would be arrested because nothing in the house belonged to her, and it was all his property. Next, the Defendant said that all the guns in the house were registered but they were not registered to him. He further said that he believed that he could lawfully possess the firearms because he had

been told by a Jefferson County Deputy Sheriff that he could vote, and therefore, his rights had been restored and he could possess firearms.

When the search was more than one-half complete, a Jefferson County Deputy Sheriff came into the kitchen and asked the Defendant if there were anymore firearms in the house. The Defendant, at this point, asserted his right to counsel, and did not answer the question. About twenty minutes after asserting his rights, the Defendant spontaneously said to Gary without being asked any questions that there was a firearm within his arm's reach on a shelf near him in the kitchen area in the front of the house. The Defendant pointed out this firearm, which was a pistol, to Gary and leaned forward so that Gary could seize the pistol. The pistol was a fully loaded .22 caliber Erma- Werke handgun, and Gary seized the firearm.

It should be noted that the Defendant and his wife testified at the hearing on this matter. Although their testimony differed from the agents in some details, it was similar in many respects. For instance, they testified that the agents treated them courteously, did not raise their voices to them, did not threaten them or promise them anything, talked to them for a maximum of two minutes before executing the search warrant, knocked not more than twice on the front door, and entered without specifically being invited into the house. The Defendant also admitted that he told Gary that everything in the house belonged to him and not his wife, that the weapons were registered but not to him, that he believed that he could legally possess the firearms, and that he volunteered to Gary that there was a loaded handgun within his reach.

Significantly, the Defendant says he did not state that he had firearms or weapons or shotguns or rifles in the house. He says he was specifically asked if he had firearms and in response to that specific question said, "Maybe. But you can't look around my house without a warrant." The

Defendant also testified that he claimed his attorney/client privilege while talking to the agent in the foyer or entryway of the house during the first two minutes of the conversation. He says he stated that you can't search my house, and I won't talk to you without an attorney present. Further, the Defendant testified that although he was treated courteously, he was nevertheless intimidated by the agents demeanor.

As to the credibility of the witnesses, the undersigned notes that the Defendant admitted he has convictions for stealing by deceit, tampering, fraudulent checks, and sodomy. He was sentenced to thirteen years imprisonment on these convictions. Although his wife has no convictions, she has an obvious personal interest in a favorable outcome of this matter to the Defendant. In addition, although the agents have an interest in a favorable outcome, it is a professional interest and not a personal one. Further, the undersigned concludes that it is reasonable to assume that the Defendant, in fact, did tell the agents that he had rifles and shotgun on the premises based on the context of these statements and their relationship to the entire factual situation as it unfolded at #2 Manderly Court. First, it is believable that the Defendant stated he had weapons on the premises in the form of rifles and shotguns because, as the Defendant own's testimony revealed, he believed he could lawfully possess these weapons because he had been told so by a Jefferson County Sheriff's Deputy, and the Jefferson County Sheriff's Department was present at the scene at #2 Manderly Court along with the FBI. Further, if the FBI agents and officers wanted to place words in the Defendant's mouth, they surely would testify that the Defendant said that he allowed them to look around the house based on their ruse. Their avowed purpose for going to the premises as stated in their affidavit was to gain access to the premises by way of a ruse so they could observe firearms and thereby execute the search warrant. By instead stating truthfully (in the conclusion of the undersigned), that the Defendant

stated that there were firearms and weapons on the premises but refused them the right to search, they in fact injected multiple issues into this matter. Therefore, based on the demeanor of the witnesses as observed by the undersigned, the context of the testimony of the witnesses, the interests of the parties in the case, and the convictions of one of the witnesses for a crime of deceit, the undersigned accepts the testimony of Eaton and Gary in its entirety and rejects that portion of the testimony of the Defendant and his wife which conflicts with Eaton and Gary.

**Conclusions of Law**

A.  Entry into the Defendant's Home

Based on the above findings, the undersigned concludes that the entry by Eaton into the Defendant's house was consented to by the Defendant and therefore, Eaton's initial entry into the foyer was lawful.

In United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975), a Kansas City police officer and a Secret Service agent went to the defendant's house to investigate a counterfeiting matter. They rang the doorbell and an individual answered the door. The officers identified themselves, and the defendant opened the inside door a few feet and stepped back. After the defendant did this, the officers opened an unlocked screen door and entered the house. After entering the house, they immediately smelled a strong odor of marijuana and observed other marijuana in the room. Eventually, the officers arrested both individuals in the house and charged them with possession of marijuana with intent to distribute it. In upholding the entry into the premises and a later seizure of the marijuana as lawful, the court stated as follows:

> Turbyfill says, however, that even if Church had authority to permit others to enter the dwelling, nothing done by Church was an invitation to the officers to enter the house and thus be in a position to see the marihuana which was first observed. An invitation or consent to enter a house may be implied as well as expressed. There was no error in the determination

10

of the district court that the action of Church in the opening of the door and stepping back constituted an implied invitation to enter. The entry of the officers was lawful. Once in the house they were justified in seizing the marihuana which was in plain view in the shoe box on the table.

525 F.2d 57, 59 (8th Cir. 1975).

In United States v. Curnett, 123 Fed.Appx. 733 (8th Cir. 2005), the court was again faced with a situation where a police officer went to the door and told the defendant that he had to talk to the defendant. The defendant stood aside as if to allow the agent to enter, and the agent did enter the house. In upholding this procedure as lawful, the court stated as follows:

> Finally, Curnett argues that the district court made an error in law in finding that Curnett's act of stepping aside to let Chief Poletis into the home constituted an implied consent to the entry. We disagree. We have held that nearly identical actions constitute implied consent to entry. . . .see also United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (finding consent by a resident who stepped aside, motioned officers in, even though the officers had previously drawn their weapons.) Because Curnett's actions were sufficient to allow a reasonable officer to infer consent to enter, we find the entry was lawful. Consequently, the evidence seized from Curnett's home was not the fruit of an unlawful search.

123 Fed.Appx. 733, 735.

In United States v. Mahoney, 712 F.2d 956 (5th Cir. 1983), five Houston police officers went to Mahoney's door to execute an arrest warrant. They knocked on the door and a friend of Mahoney's, in response to the knock, opened the door and stepped back. One of the officers stepped into the room at that time, determined that the defendant was seated on a couch fifteen feet away from the door, and arrested the defendant. In holding that the officers in good faith believed that Mahoney's friend had consented to their entry, the court stated as follows:

> [T]he officers reasonably could have believed that Mahoney's friend consented to their entry when he opened the door and took a step back. For example, in United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975), the court found that a person who opened the door and stepped back impliedly invited the police to enter. That Payton

> v. New York, may have eroded the full force of <u>Turbyfill</u> does not answer our inquiry. Consensual entry remained legal.

712 F.2d 956, 961 (5th Cir. 1983).

Based on the above law, the undersigned concludes that the entry of the Defendant's house was consensual, and that the officers, therefore, were lawfully in the foyer of the Defendant's home at the time that they had discussions with him. The agents were in full uniform, the deputy sheriff knocked on the door, and properly identified himself as being from the sheriff's department when asked by the Defendant. After the deputy sheriff identified himself, the Defendant opened the door, and took a step back from the door. Based on the body language of the Defendant and the fact that he stepped back from the door and gave them room to enter the home, the agents believed that the Defendant was impliedly telling them they could enter the house. Further, once Eaton took one step into the foyer area to talk to the Defendant, the Defendant did not object to Eaton entering the house, did not tell him to not enter the house, and did not ask him to leave, thus, confirming Eaton's prior conclusion. Therefore, the undersigned concludes that the entry was consensual and, therefore, lawful. <u>See also United States v. Donlin</u>, 909 F.2d 650, 655 (1st Cir. 1990) (defendant ordered officers off his property but then opened screen door to his house so they could enter); <u>United States v. Griffin</u>, 530 F.2d 739 (7th Cir. 1976) (after slamming door on officers the first time, they knocked, defendant opened door and stepped back in response to second knock); <u>United States v. Impink</u>, 728 F.2d 1228, 1233 (9th Cir. 1984) (in most implied consent cases, the suspect himself takes some action and implies consent).

### B. The Defendant's Statements Prior to the House Being Searched

#### 1. Custody

Based on the above findings, the undersigned concludes that the statements of the Defendant made before the initial search of the house and the Defendant being handcuffed were non-custodial statements. In determining whether the Defendant was in custody, the court must consider whether under the totality of the circumstances the agents deprived the Defendant of his freedom of action in a significant way and if a reasonable person under similar circumstances would believe that he was under arrest. See Berkemer v. McCarty, 468 U.S. 420 (1984).

In United States v. Sutera, 933 F.2d 641 (8th Cir. 1991), FBI agents executed a search warrant on the defendant's apartment, defendant's car, and on defendant's person, thoroughly searched the defendant's person and frisked him for weapons. His movement was also restricted in his apartment in that he could not go into areas that were being searched, and was accompanied by agents. He was further accompanied to a second location by agents to obtain documents. In stating that the defendant was not in custody, the court stated as follows:

> It is also relevant that Sutera was "on his own turf." Except for the brief period when Sutera and Burns drove to get the address book, Sutera was interviewed in the apartment that he was occupying. While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation.

United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991).

In United States v. Axsom, 289 F.3d 496 (8th Cir. 2002), nine FBI agents executed a search warrant at the defendant's house at 6:45 a.m. The defendant answered the door wearing only a towel and the nine agents immediately entered the house. As soon as they entered the house, they observed several firearms hanging on the walls of the premises, and at least three Samurai swords also in plain view. They first proceeded to secure the weapons. Next, the agents escorted the defendant to his bedroom where he was allowed to dress, and taken to the living room where he was told to sit down

on the couch.  Two agents then interviewed the defendant for about an hour.  When the defendant

got up as if to get a drink of water, the agents did not allow him to get a drink, and instead told him

that they would get the water for him.  When the defendant wanted to go to the bathroom, he was

escorted by an agent to the bathroom and not allowed to go alone.  In stating the test to be followed

in determining whether the defendant was in custody, the court stated:

> Custody occurs when a suspect is deprived of his freedom of action in any significant
> manner. . .In deciding whether a person was "in custody," we must examine both the
> presence and extent of physical and psychological restraints placed upon the person's
> liberty during interrogation "in light of whether a 'reasonable person in the suspect's
> position would have understood his situation' to be one of custody." . . .  Thus, if
> Axsom believed his freedom of action had been restrained to a "degree associated
> with formal arrest" and his "belief was reasonable from an objective viewpoint," then
> Axsom was "held in custody during the interrogation."

289 F.3d 496, 500.     In determining that the defendant was not in custody because of a police

dominated atmosphere with the nine agents being in the house, the court stated that this was

mitigated by the fact that only two agents were involved in the interview while the rest searched the

premises.  They further held that the fact that the defendant's movements were restricted during his

interview was not enough to show that he was "in custody."  In so holding, the court stated as

follows:

> While nine persons participated in the execution of the search warrant, only two
> agents conducted the interview. . .Photographs of Axsom and federal agents taken at
> or near the time of the questioning reflect a more casual scene than a police
> dominated, inherently coercive interrogation.  When a suspect is interrogated in the
> comfort and familiarity of his home, a court is less likely to find the circumstances
> custodial.

289 F.3d 496, 502.  As to the fact that Axsom's freedom of action was limited, the court stated as

follows in holding that the defendant was not in custody:

> Although the evidence exists to support the district court's finding that the agents
> restrained Axsom's freedom of action, his freedom was not restrained to a degree

> associated with formal arrest. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). Axsom was not handcuffed nor was he confined to one room.

<u>Axsom</u>, 289 F.3d 496, 502. <u>See</u> <u>also</u> <u>United States v. Galceran</u>, 301 F.3d 927 (8th Cir. 2002).

Based on the above, the undersigned concludes that the Defendant was not in custody during the initial inquiry into this matter. As in <u>Axsom</u>, <u>supra</u>, although there were seven agents at the Defendant's door, the evidence showed that only Eaton and two other agents entered the premises during the initial questioning. In addition, the questioning lasted only two minutes according to both the Defendant and the agent. In addition, the Defendant's movements were not restricted during this two-minute time frame, and the agents did not raise their voices to the Defendant or otherwise threaten, coerce, or promise him anything. During the interview, he was standing in his own foyer with the agents not even telling him that he was a suspect in any criminal activity. This being the case, the undersigned concludes that as in <u>Sutera</u> and <u>Axsom</u>, above, the Defendant was not in custody in this matter, and his movement was not restricted in any significant way consistent with formal arrest. Therefore, the undersigned concludes that the Defendant could not reasonably believe that he was in custody while standing in his living room being asked by the agents if a third party was present. The fact that the Defendant may have subjectively held the view that he was not free to walk around or that he was in custody does not change the undersigned's conclusion that a reasonable person should not have held the view that the Defendant was under arrest during this short two minute time period. Thus, the undersigned concludes that the Defendant's statements were non-custodial, and it was not required that the Defendant be given his <u>Miranda</u> warnings. <u>See</u> <u>Berkemer v. McCarty</u>, <u>supra</u>. The fact that the subject may have been a suspect in a crime does not trigger any right on his part to be given <u>Miranda</u> warnings. <u>California v. Beheler</u>, 463 U.S. 1121 (1983).

2. Pre-arrest Statements

Based upon the above facts, the undersigned concludes further that the statements of the Defendant made during the first two minutes of his contact with the law enforcement agents were voluntarily made. Regarding statements made under circumstances such as exist in the present case, the Eighth Circuit Court of Appeals has stated:

> The appropriate test for determining the voluntariness of a confession is whether in light of the totality of the circumstances the pressure exerted on the suspect has overborne his will.

United States v.Meirovitz, 918 F.2d 1376 (8th Cir. 1990). Further, as to this test, the court stated as follows:

> "[C]oercive police activity is a 'necessary predicate to finding that a confession is not "voluntary" within the meaning of the due process clause of the Fourteenth Amendment.' " . . .Factors relevant to a determination that police conduct is coercive include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep."

See United States v. Gillaum, 372 F.3d 848, 856, 857 (8th Cir. 2004).

In making this determination, courts will inquire into the totality of the circumstances in assessing the conduct of law enforcement officials and the suspect's capacity to resist. False statements made to a defendant stating that a co-defendant had confessed implicating a defendant have been held to be insufficient to overcome the voluntariness of a confession. In upholding the voluntariness of a confession under these circumstances, the Supreme Court stated as follows:

> The questioning was of short duration, and petitioner was a mature individual with normal intelligence. The fact that the police misrepresented the statements that Rawls had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible. These cases must be decided by viewing the 'totality of the circumstances,'. . .

Frazier v. Cupp, 394 U.S. 731, 739 (1969).

In holding that the defendant's mental health condition and his statements that he had been hearing voices and was suicidal were not sufficient to overbear his will, the court stated as follows:

> Although mental condition is relevant to a suspect's susceptibility to police coercion, coercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause. . . Even if police were coercive, Galceran failed to show he suffered from a mental illness at the time of the interview that, when combined with coercion, produced a confession that was not a product of his own free intellect. . .Indeed, the Government's evidence shows Galceran was rational and freely gave his statement.

United States v. Galceran, 301 F.3d 927, 931.

In addition, as stated, the Defendant's familiarity with the law enforcement system is also something that may be considered in determining whether the Defendant's will was overborne. See, United States v. Gillaum, supra; Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995) (confession voluntary despite low IQ because defendant had numerous experiences with law enforcement and was street wise); United States v. Haynes, 301 F.3d 669, 684 (6th Cir. 2002) (confession voluntary because forty-three year old defendant informed of his rights and had "ample" experience in the criminal justice system).

Based on the above, the undersigned concludes that the Government has made a legally sufficient showing that the statements made by the Defendant were voluntarily made. Although seven agents came to the Defendant's house, only three entered the house to initially talk to the Defendant. The testimony from both the Defendant and the Government agent was that the agents never raised their voices, never pulled their guns, and treated the Defendant courteously. The agent addressed the Defendant in a business-like manner, according to his testimony; and according to the Defendant, he spoke with "authority." According to the Defendant's own admission, he had substantial experience with law enforcement, and understood his rights including the right not to talk to an agent

without an attorney present, and the right to have his home searched only if a warrant was issued based on probable cause. Otherwise, the Defendant stated he would be subject to "unreasonable" search and seizure. In short, the Defendant was no neophyte to the criminal justice system nor was he, in the view of the undersigned who observed the Defendant's demeanor on the stand, a "shrinking violet."[4] The Defendant was well aware of his rights based on his testimony in the courtroom, and would not have hesitated to assert his rights had he believed it was in his interest. Indeed, according to the testimony which the undersigned credits the Defendant did assert his rights about an hour into the search when questioned by a deputy sheriff as to whether there were any other firearms on the premises. Therefore, the undersigned concludes, the statement was voluntarily made.

### C. The Arrest of the Defendant

Based on the above, the undersigned concludes that the arrest of the Defendant was based on probable cause, and was therefore lawful. Police officers may arrest a person without a warrant if they have probable cause to believe that the person arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed,

---

[4] The undersigned concludes that the ruse used by the agents (which failed because the Defendant refused to allow the agents to search the house) did not materially affect any statements made by the Defendant. The Defendant was aware that he was talking to agents and deputy sheriffs and they were asking for admission to his house so they could look around. Any misstatement about why they wanted to look around, the undersigned concludes, did not affect the voluntariness of the statements. The ruse failed and was negligible when compared to making up a confession of a co-defendant which had been held insufficient to render a statement involuntary. See Frazier v. Cupp, supra.

and that the defendant committed it.  See Illinois v. Gates, supra.  It is also clear that information

from a reliable informant without more may provide probable cause for an arrest or the issuance of

a search warrant.  See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1992).  In addition, even an

anonymous tip from a crime stopper's hotline or information from an informant whose reliability has

not been tested is sufficient information upon which to create probable cause as long as there is

sufficient factual basis provided by the person, and the statement is otherwise shown to be reliable

through corroboration of even innocent details.  See United States v. Briley, 726 F.2d 1301 (8th Cir.

1984).

Based on the above law, the undersigned concludes that there was ample probable cause to

arrest the Defendant.  The agents were aware from a confidential informant that some months prior

to the agents gaining access to the Defendant's home he was in possession of numerous shotguns,

rifles, and handguns, many of which were mounted on the walls of his prior residence.  Further, the

officers received information from a Festus City detective that the Defendant had recently moved to

Festus, and  that the detective had information that the Defendant had displayed firearms on the walls

of  his prior residence, and that the Defendant was, in addition, a convicted felon.  A third informant

told the agents that in December, 2005, the informant observed the Defendant in possession of a

firearm while traveling in his vehicle.  Further, it was the agent's belief from many years of

investigating firearms violations that a person like the Defendant who owns numerous firearms and

displayed them in this manner, tended to own these firearms for many years.   Therefore, they

believed that it was  probable that the Defendant  still possessed the firearms in his home.  Further,

other sources told Eaton that the Defendant had used a firearm to shoot a police officer in

Albuquerque, New Mexico, and that the Defendant  carried a firearm with him at all times.  Eaton

was also aware that the Defendant was a convicted felon who had been sentenced to serve thirteen years in the Missouri state penitentiary. Most significantly, the Defendant told Eaton that just prior to his arrest, he had shotguns and rifles in his house and in his possession at that very time. When the Defendant admitted to Eaton that he was in possession of firearms at the present time, along with the information that Eaton possessed from the various confidential informants and the sheriffs, the undersigned concludes that there was, at the very least, a "fair probability" that the Defendant was a felon in possession of a firearm. Thus, the undersigned concludes that the arrest of the Defendant was based on probable cause and was lawful.

D.  The Protective Sweep

Based on the above, the undersigned concludes that the protective sweep conducted by the officers was based on reasonable suspicion and was lawful.

In United States v. Cash, 378 F.2d 745 (8th Cir. 2004), a police officer in Des Moines, Iowa, received an anonymous call from an individual who said he had been on a specific premises that same day, and had seen his child's babysitter in possession of a "brick" of what he believed to be marijuana, and a "brick" of a white powdery substance. Further, when asked by the anonymous caller why this person, whose name was Karen, possessed these materials, she told him because "she had to make a living." The officers checked the information they received from the anonymous caller and found that the defendant, whose name was Karen, lived at the residence that the informant described and they further discovered that there was an outstanding arrest warrant for her. The officers went to the address, and contacted the defendant telling her that they had a warrant for her arrest. While on her premises, they noticed that she was nervous and moved a bag behind a counter when they entered her house. Eventually, they arrested the defendant and made a protective sweep search of the

residence which was a five room house. The officers did this because, in their experience, they believed that the Defendant was possibly a drug dealer, and there could be someone else in the residence who could pose a danger to them. They also noted that the defendant was very nervous when they talked to her, and this made them suspicious. Further, there was no specific information that anyone else was on the premises, nor did they observe or hear anyone on the premises. During the sweep search looking for other individuals, they observed in plain view marijuana, and eventually obtained a warrant to search the entire house, eventually prosecuting the defendant. In upholding the sweep search, the court stated as follows:

> In Buie, six or seven police officers entered the defendant's residence to execute a warrant for his arrest. The defendant emerged from the basement and was taken into custody. One officer then entered the basement "in case there was someone else" present, and he seized evidence he found in plain view. . . The Supreme Court held that this type of protective sweep is permissible without a search warrant or probable cause, noting that the officers' legitimate interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack" is "sufficient to outweigh the intrusion such procedures may entail.". . . Applying this standard, we conclude that the district court correctly upheld the protective sweep of Cash's residence.

> Cash's extreme nervousness toward the officers and her furtiveness in concealing the shopping bag from the officers were significant factors which we have previously held may establish reasonable suspicion for a Terry stop. . .

> Since an officer confronting a nervous and furtive suspect on the street has an articulable reason to be concerned for his safety and may therefore conduct a Terry stop and frisk, it follows that an officer arresting a nervous and furtive suspect in an unfamiliar residence has an articulable reason to be concerned for his own safety and may therefore conduct a Buie sweep. . .[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on an adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings. . .

> It is also a significant factor that the officers had been advised that Cash was in possession of large quantities of drugs. In upholding a Terry stop and frisk, we have previously held that "[i]t is reasonable for an officer to believe that an individual may

be armed and dangerous when that individual is suspected of being involved in a drug transaction because weapons and violence are frequently associated with drug transactions."

378 F.3d 745, 747-48.

Further, the court summarized its ruling in <u>Cash</u> as follows:

In sum, the district court correctly concluded that a rational and prudent police officer could reasonably suspect that the residence harbored one or more potentially dangerous individuals based on (1) the tip that Cash possessed large quantities of drugs, coupled with Edward's training and experience regarding the danger involved in dealing with individuals associated with large quantities of drugs; and (2) Cash's extreme nervousness in interacting with the officers and her furtive concealment of the shopping bag. Accordingly, we affirm the judgment of the district court.

<u>Cash</u>, <u>supra</u> at 749.

In <u>United States v. Boyd</u>, 180 F.3d 967 (8th Cir. 1999), deputy marshals were in possession of a valid arrest warrant for a parole violation in relation to drug crimes. They went to his premises, and were admitted by his brother and girlfriend who they immediately detained. They determined from the defendant's girlfriend, that the defendant was in a second floor bedroom, and "two of the deputies went to the bedroom and arrested the defendant. After the defendant was arrested, he was removed to the downstairs, and all three of the individuals in the house, including the defendant, were handcuffed for the safety of the deputy marshals. The deputies then performed a protective sweep of the premises. During this protective sweep for other individuals, the agents discovered guns, drugs, and false identification, all of which were introduced in evidence against the defendant. There was no information that there were any other individuals in the house.

In upholding the sweep search and the items found during the search as lawful against a claim that there was no reasonable suspicion that any other persons were in the house, the court stated as follows:

Under Maryland v. Buie, 494 U.S. 325 (1990), a "protective sweep" is justified in connection with an in-home arrest if an officer reasonably believes that the area to be swept harbors an individual posing a danger to those at the arrest scene. . .

The fact that Boyd had already been handcuffed and taken to the downstairs area and Adler had briefly glanced around the room before Kuster performed his visual inspection of the bedroom and closet does not invalidate the protective sweep. See Buie, 494 U.S. at 334, 110 S.Ct. 1093 (Officers are permitted to take steps to ensure their safety both "after and while making an arrest."). . . "When the law enforcement officers entered the house they had no way of knowing how many people were there." United States v. Horne, 4 F.3d 579 (8th Cir. 1993), the search was "quick and limited," . . .and initially confined to places large enough to conceal a person. We conclude the protective sweep was proper.

180 F.3d 967, 975, 976.

Further, the court held that the evidence seized during the sweep could be used in evidence in trial against the defendants. In so holding, the court stated as follows:

Because the physical evidence was discovered in plain view during the course of a valid protective sweep, it was admissible at trial.

180 F.3d 967, 976.

Based on the above law, the undersigned concludes that a protective sweep in the case now at bar is justified. The reasons for the search in the present case are at least as compelling if not more compelling than were the facts in Cash, supra. In the case now at bar, agents were aware that the Defendant had, on prior occasions, possessed numerous firearms and displayed them on the walls of his prior house. In addition, the Defendant had admitted that he was currently in possession of shotguns and rifles, and he did not want the agents or anyone else moving around his house because of the firearms that were on the premises. Further, the agents observed in plain view, and in close proximity to the front door bladed weapons which appeared to be real and were accessible to the Defendant as soon as they entered the premises. These included Samurai swords as well as clubs with sharp metal spikes protruding from them. Further, the agents were aware that the Defendant claimed

23

to have shot at least one police officer, and said he would rather die in a shootout with police than go back to jail because of his health conditions. They also were aware that he always carried a gun and money with him so he could flee at a moment's notice. The agents also stated that they had no way of knowing who else was on the premises and in the house. Under these circumstances, the undersigned concludes the agents acted in a reasonable manner in conducting a limited sweep search of the premises to determine if anyone else was in the house.

In making this sweep search, the officers testified that they only looked in areas where a person could hide, and Eaton observed shotguns and other firearms in plain view mounted on the walls of the first room that he had looked into for a person, which was not more than fifteen feet from where the Defendant was arrested. Based on the above, the undersigned concludes that as in Cash and Boyd, supra, the sweep search was cursory and quickly completed only of areas where a person could hide, and the agents observed the firearms in plain view in an area where they were entitled to be standing. Therefore, the search was lawful as was their observation of the weapons.

### E. The Search Warrant and its Execution

Based on the above, the undersigned concludes that the search warrant was based on probable cause and was properly executed.

For a search warrant to be valid, it must be based upon the finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched. Johnson v. United States, 333 U.S.

10 (1948); <u>Warden v. Hayden</u>, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

<u>Brinegar v. United States</u>, 338 U.S. 160, 175 (1979). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars but as understood by those versed in the field of law enforcement." <u>Illinois v. Gates</u>, at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. <u>See</u> <u>Illinois v. Gates</u>, <u>supra</u>. It is also clear that information from a reliable informant without more may provide probable cause for the issuance of a search warrant. <u>See</u> <u>United States v. Pressley</u>, 978 F.2d 1026 (8th Cir. 1982). In addition, even an anonymous tip from a crime stopper's hotline or an informant whose reliability has not been tested is sufficient upon which to create probable cause as long as there is adequate corroboration of even innocent details. <u>See</u> <u>United States v. Briley</u>, 726 F.2d 1301 (8th Cir. 1984).

In addition, anticipatory search warrants have been upheld as lawful in all circuits in which they have been considered including this circuit. <u>See</u> <u>United States v. Walker</u>, 324 F.3d 1032 (8th Cir. 2003); <u>United States v. Tagbering</u>, 985 F.2d 946 (8th Cir. 1993). In <u>United States v. Garcia</u>, 882 F.2d 699 (2nd Cir. 1989), one of the first cases to uphold the constitutionality of anticipatory search warrants, the court defined these warrants as follows:

An anticipatory warrant, by definition, is a warrant that has been issued before the necessary events have occurred which will allow a constitutional search of the premises; if those events do not transpire, the warrant is void.

882 F.2d 699, 702.

In commenting favorably on the opinion in <u>Garcia</u>, <u>supra</u>, the Eighth Circuit stated as follows:

As the Second Circuit explained in <u>United States v. Garcia</u>, 889 F.2d 699, 702 (2nd Cir.). . ." the fact that the contraband is not presently located at the place described in the warrant is immaterial so long as there is probable cause to believe that it will be there when the search warrant is executed."

<u>Tagbering</u>, 985 F.2d 946, 949.

Further, an anticipatory search warrant need not be based on delivery controlled by the government. However, as the Second Circuit in <u>Rivera v. United States</u>, 928 F.2d 592 (2nd Cir. 1991):

In such circumstances, the magistrate should require a particularized showing of strong reason to believe the contraband will in fact be on the targeted premises at the time the warrant is executed.

928 F.2d 592, 603, 604.

In addition, contrary to the statement made by the Defendant, the agents believed based on their experience that a person who possesses multiple firearms in a manner that the Defendant possessed them is likely to possess the firearms for many years, and therefore the agents' belief that the Defendant was still probably in possession of the weapons is a circumstance which the magistrate could consider in determining that the guns were still on the premises after the time lapse of ten or eleven months.

In <u>United States v. Maxim</u>, 55 F.3d 394 (8th Cir. 1995), the court determined that a lapse of time involving a period of four months or even four years did not vitiate the warrant or make it stale. First, the court determined that the possession of firearms by a convicted felon was a continuing

26

offense, which continued to occur each day the defendant possessed the weapons. Most importantly, the court considered the information provided by the agent that gun enthusiasts tend to possess weapons for up to twenty years as crucial and providing the probable cause. In so holding, the court stated as follows:

> The nature of the evidence sought in this case also minimizes the importance of the time lapse. The affidavit was supported by Special Agent Wactor's statement that, based on his professional experience, survivalists and other firearm enthusiasts such as Maxim tended to hold onto their firearms for long periods of time--often as long as ten or twenty years. . . . Based on the continuing nature of Maxim's crimes and Special Agent Wactor's testimony, we can not say that the information provided by Benanti was stale.

United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995). See also, United States v. Caswell, 436 F.3d 894 (8th Cir. 2006) (statement by an agent in a search warrant that "persons dealing in narcotics will often have additional amounts in their homes" are the circumstances from which a judge can infer probable cause to search a home even though there is no direct evidence of narcotics in the home.) United States v. Caswell, 436 F.3d 894, 898, 899.

Based on the above, the undersigned concludes that there is ample probable cause to support a search of the Defendant's home. The affidavit recites information from two separate informants, the first stating that the Defendant was observed in possession of a gun in his car; in December, 2005, the second informant telling the agents that the Defendant owned or possessed multiple handguns, shotgun, and other long guns, many of which were displayed on the walls of his prior home approximately eleven months before the search. Also included in the affidavit was information from a Festus detective that he likewise had information that the Defendant was a convicted felon who was in possession of guns mounted on his walls while he lived in a prior residence in Jefferson County. In addition, the agents told the magistrate judge that based on their training and experience an

individual like the Defendant who possessed firearms in this manner tended to keep the firearms for a period of many years and was still probably in possession of the firearms. This statement, although it did not say that the Defendant was a gun enthusiast or a survivalist as was the case in <u>Maxim</u>, <u>supra</u>, was nevertheless a statement based on the agent's expertise that the magistrate could consider in making a determination that the Defendant was still likely in possession of firearms at his new residence. This inference, although arguably not as strong as in <u>Maxim</u>, <u>supra</u>, nevertheless is based on the agent's experience, and this along with the fact that there were numerous guns displayed on many walls in the Defendant's prior residence, gave the magistrate judge reason to infer that they might probably still be on the walls of the new residence. This inference and statement is very analogous to the statement by the agents in <u>Caswell</u>, <u>supra</u>, that persons dealing in narcotics will often have additional narcotics in their home. For the above reasons, the undersigned concludes that it was reasonable for the magistrate judge to consider the statements by the Festus officer and the two informants as well as the statement by the agents in determining possible probable cause of firearms being in the new house.

In addition, the condition precedent on which the warrant was to be executed removed any doubt as to whether or not probable cause would exist at the time of the execution of the warrant. As in <u>Rivera</u>, <u>supra</u>, this warrant was not based on the controlled delivery by a government agent. As such, the magistrate should have required and did require a particularized showing of strong reasons to believe that the contraband would, in fact, be on the targeted premises at the time the warrant was executed. He required that the agents observe firearms on the premises prior to the execution of the warrant. Therefore, based on this condition which the undersigned concludes was

fulfilled prior to the actual execution of the warrant, the Court finds that there was probable cause for the warrant.

As to the execution of the warrant, the undersigned concludes that based on the above findings and the testimony of the agent, prior to the actual execution of the warrant, a protective sweep was made of the premises.[5] The testimony at the hearing was that the Defendant was arrested and given the search warrant at the same time. The agent also testified that, regardless, a protective sweep was going to occur and did occur solely pursuant to the arrest of the Defendant. This protective sweep took place prior to the agents seizing the numerous loaded pistols and assault weapons which eventually were taken during the execution of the search warrant. During the protective sweep of the various rooms of the house(during which agents looked quickly in each room of the house in places where individuals could be concealed), the agents observed in plain view firearms on the walls of the computer room. This substantially complied with the search warrant condition, that they observe weapons prior to the warrant being actually executed, and thus, the warrant was executed in a lawful manner.[6]

---

[5] As stated in footnote 3 above, Eaton testified that he "executed" the warrant at the time the Defendant said guns were in the house and he was arrested. He also testified unequivocally that once the Defendant was arrested, a protective sweep occurred solely incident to the arrest, and that the firearms were observed for the first time during the protective sweep pursuant to the arrest. This occurred prior to the execution of the warrant in any real terms.

[6] In addition and alternatively, the protective sweep pursuant to the arrest was going to occur and did occur no matter what else took place. Therefore, the evidence would have been discovered by lawful means because the agents were actively performing this sweep at the same time. Therefore, the undesigned concludes, that the firearms were observed lawfully because they would have and were inevitably discovered. See United States v. Boyd, 180 F.3d 967, 979.

The undersigned also concludes that the Defendant's admission that there were rifles and shotguns currently in the house was the good faith factual and legal equivalent of observing the firearms. See generally United States v. Leon, 468 U.S. 897 (1984).

### F.  Statement Made to Agent Gary After the Defendant's Arrest

The undersigned concludes that the Defendant's statements made to Agent Gary after the arrest of the Defendant while he was sitting with Gary during the execution of the search warrant were voluntarily made volunteered statements and therefore admissible.  These statements included the following: Defendant's question to Gary about whether or not his trailer would be seized; his statement that everything in the house belonged to him and not to his wife; his statement that the firearms in the home were all registered but they were just not registered to him; his statement that he believed he could legally possess the firearms, and finally, his statement to Gary that there was a gun within his arm's reach while he was seated at the kitchen table and the pointing out of the gun to Gary.  Each of these statements was made by the Defendant on his own and not in response to any explicit or implicit questions being asked of him.  He was not threatened in any manner, was not coerced, and no promises were made to him to induce any statements.  He appeared to be well-oriented, attentive, and not under the influence of any drugs or alcohol.  Therefore, the undersigned concludes that the statements were voluntarily made volunteered statements not in response to any questions, and therefore were lawful and should not be suppressed.  See Rhode Island v. Innis, 446 U.S. 291 (1980).

**Conclusion**

Based on the above, the undersigned finds that the motion to suppress evidence and the motion to suppress statements should be denied.

* * *

A recommendation of United States Magistrate Judge is filed herewith.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of February, 2007.